# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Case No.: 15-CR-080 |
| | § | |
| KIRK LAWRENCE BRANNAN | § | |

## GOVERNMENT'S TRIAL BRIEF AND MOTIONS *IN LIMINE*

COMES NOW the United States of America, by and through its United States Attorney for the Southern District of Texas, and files this Trial Brief and Motions *in Limine*. The government seeks to pre-admit exhibits and exclude certain improper argument, questioning, and evidence.

## BACKGROUND

On February 18, 2015, the grand jury returned a two-count indictment charging defendant Kirk Brannan and his co-conspirators with one count of conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. §1349, and one count of bank fraud in violation of 18 U.S.C. §1344. Defendants Chucobie Lanier, Derwin Blackshear, and David Morris have entered guilty pleas. Trial of defendant Brannan is currently set for May 7, 2018.

The indictment describes a mortgage fraud scheme that ran from 2005 until May 15, 2009. The scheme was investigated by the FBI and the Texas Department of Public Safety (DPS). In 2006 and 2007, defendant Brannan sold ten beach homes

in the Freeport/Surfside, Texas area to "straw buyers" at exorbitant prices. All ten of the properties Brannan sold ended up in foreclosure. Brannan sold the beach homes himself, through his family limited partnership, "Beach Candy," and through his children. Brannan is heavily involved in the real estate business in Surfside. His businesses include Brannan Realty, Inc. and Brannan Resort Rentals, which rents beach homes. Brannan is also an attorney who specializes in real estate and tax law, and he is a real estate agent.

Brannan sold his beach homes with the assistance of the A. Cole Realty Group in Houston. Defendant Chucobie Lanier was associated with Cole Realty and brought Brannan's business to that office. Also working with Lanier at Cole Realty were defendants Blackshear, Morris, and an individual named Shawn Mitchell. Cole Realty was heavily involved in mortgage fraud in the Houston area. The United States successfully prosecuted Adrian Cole for mortgage fraud, and he is currently in prison. The Harris County District Attorney's Office prosecuted Mitchell for mortgage fraud. Mitchell served his time in state custody and was recently released.

Blackshear, Morris, Mitchell, an individual named James Fitchett (also prosecuted by the state), and others recruited straw buyers to purchase Brannan's beach homes and other homes around the greater Houston area. They recruited unsophisticated individuals to serve as straw buyers in what they termed, "a real estate investment opportunity," by promising to pay the straw buyers for each home

they purchased. They told the straw buyers that all they needed in order to "invest" was good credit, and that they did not have to put any money down of their own. The straw buyers just had to be willing to sign mortgage loan documents, which typically they did not read before signing. According to the recruiters, the homes would be rented and then flipped to another buyer within a year.

The straw buyers signed loan applications that had been prepared for them. The applications contained numerous misrepresentations that lenders relied upon in deciding to make the mortgage loans. The misrepresentations suggested that the buyers were much better credit risks than they actually were. Each application typically included misrepresentations about the buyer's present address, employer, gross monthly income, combined monthly housing expense, and that the property would be the buyer's primary residence.

Brannan sold his beach properties to the straw buyers at prices that were two-to-three times the appraised values set by the Brazoria County Appraisal District. The mortgage lenders, including Wells Fargo Bank, were induced to lend the inflated amounts for the purchases through flawed or fraudulent appraisals. The lenders relied on the appraisals to know that their loans were secured by an asset of sufficient value to cover the amount of the loan.

To appraise the value of a property, an appraiser normally relies upon three comparable sales ("comps") from the same area as the property being appraised. For

Brannan's properties, the appraisers primarily relied upon three comps that Brannan had manufactured for the purpose of the scheme. Brannan created HUD-1 settlement statements that suggest that Brannan sold three of his properties, each one-day apart, on August 16, 17, and 18, 2006, to his children at exorbitant prices. For each alleged sale, he filed with Brazoria County a Warranty Deed with Vendor's Lien that suggests that the sale actually occurred and that it was owner-financed. The document was prepared at the Brannan Law Office in Lake Jackson, Texas. The HUD-1 settlement statements for the three inter-family "sales" showed Brannan selling properties to his stepdaughters Brandy Pate and Natalie Wiley and to his son-in-law and Wiley's husband, Matthew Closs. Even though these were not arms-length transactions and no money actually changed hands, the appraisers relied upon these "sales" as comparable sales in appraising Brannan's remaining properties that were sold to the straw buyers. This resulted in inflated values for Brannan's properties that were sold through the scheme. As the scheme progressed, there was an ever-expanding pool of inflated comps that could be used to appraise the next property to be sold to a straw buyer.

The primary appraiser for Brannan's beach homes that were sold to straw buyers was Ken Barnett[1], a close associate of Brannan. DPS Special Agent Leah Dalton interviewed Barnett about his inflated appraisals, and Brannan served as

---

[1] Barnett is now deceased.

Barnett's attorney during the interview. The appraisals Barnett completed for Brannan's beach homes relied upon the three inter-family sales as comps. As a result of these appraisals, the State Board of Appraisal Review filed an action against Barnett to revoke his appraiser's license. During the early stages of the disciplinary action, Brannan continued to serve as Barnett's attorney. Barnett ultimately surrendered his license, which the Board revoked. For the other appraiser who appraised one of Brannan's properties that was sold through the scheme, Brannan Resort Rentals (Brannan's beach house rental company) supplied that appraiser with the comps to use that would support the high sales price. They were again the same three comps from the inter-family "sales."

For each sale to a straw buyer, Brannan kicked back to defendant Chucobie Lanier at Cole Realty approximately fifty percent of the sales proceeds in transactions that were not reported on the HUD-1 closing statements for the sales or otherwise reported to the lender. Lanier (operating as KNJ Marketing & Investments) forwarded the funds to others at Cole Realty, including Adrian Cole, Mitchell (operating as TMAC Consulting), Blackshear (operating as Level 1 Investments and K-Mack Communications) and Morris (operating as Hy-Tech Investments), who then paid the straw buyers. The FBI has compiled bank records and other documents that trace the funds from Brannan and his family members, through the Cole organization, and to the straw buyers. In total, Brannan caused

approximately $2.4 million dollars of the excess sales proceeds and loan funds to be wired to Lanier as kickbacks.

Through this scheme, the conspirators skimmed the excess loan funds from the transactions, and Brannan was able to quickly sell a large number of properties at good prices and recover his capital investment. When the homes went into foreclosure, the banks were left with assets securing the loans that did not come close to the value of the loaned funds. In 2008 and 2009, Brannan then repurchased some of his beach homes out of foreclosure that he just had sold through the scheme into foreclosure. He repurchased the properties at prices much closer to Brazoria County's appraised values and far below the values he had obtained in his rigged sales to the straw buyers.

During the investigation, Agent Dalton interviewed Brannan, his stepdaughters Brandy Pate and Natalie Wiley, Wiley's husband Matthew Closs, and Pate's husband Brice Pate. Agent Dalton recorded interviews with Brannan and Brandy Pate. Wiley and Closs stated that they had no idea why in 2006 Brannan put properties in their names and stated that they had paid no money for the properties. Brice Pate said he knew nothing about the beach home sales and that his wife Brandy handled everything involving the beach homes.

When interviewed, Brannan claimed that he had made the three inter-family sales for legitimate tax avoidance reasons. He claimed that because of a change in

the tax laws governing partnerships, it made sense for Brannan to take properties out of the Beach Candy limited partnership and place them into the names of his children. Brandy Pate claimed during her recorded interview that she had never made payments to Lanier, despite the fact that her bank records show hundreds of thousands of dollars flowing from her bank account to Lanier.

A central figure in the scheme was Shawn Mitchell at Cole Realty. In contrast to Brannan's explanation of tax avoidance, Mitchell states that it was his idea for Brannan to conduct the three inter-family sales and that this idea was communicated to Lanier who was Brannan's contact at Cole Realty. Mitchell explains that because they could not find legitimate comps in the Surfside area that would support the necessary high appraisals, they had to manufacture comps. The scheme only works if the bank is induced to loan an excessive amount of money so that there are excess loan funds available to steal.

## ADMISSION OF THE GOVERNMENT'S EVIDENCE

The government seeks to pre-admit exhibits prior to the start of trial. Much of the government's evidence consists of documents that were obtained by subpoena to the various title companies, mortgage brokers, and lenders involved in the beach home transactions. These documents include loan files, closing files, appraisals, loan applications, contracts, and the like. These documents relate to the purchase of the beach homes by the straw buyers. The documentary evidence also includes

subpoenaed bank records that show the flow of funds from the title companies to Brannan and then from Brannan or Pate back to those at Cole Realty, and ultimately to the straw buyers. All of these documents are admissible as business records. *See* Fed. R. Evid. 803(6). The business records certifications are available for the defense to review at the U.S. Attorney's Office. *See* Fed. R. Evid. 902(11). Many of these documents contain admissions by the defendant and co-conspirator statements that are also admissible under Fed. R. Evid. 801(d)(2)(A) and 801(d)(2)(E).

In addition, the government seeks to admit title documents that are on file with the Brazoria County Clerks Office. It seeks to admit appraisal records from the Brazoria County Appraisal District. It also seeks to admit documents from the Texas State Board of Appraisal Review related to the initiation of the action against Barnett, the surrender of his license, and the Board's revocation of the license. It seeks to admit assumed name certificates from the Texas Secretary of State's Office and Drivers license photos from the State. These documents are admissible as public records under Fed. R. Evid. 803(8).

The government seeks to admit summary charts that summarize the voluminous financial records in the case and trace the flow of the money for each sale of a beach home from the title company, to the seller, back to those at the Cole Group, and ultimately to the buyer. The government also seeks to admit a summary

chart that summarizes each of the comps that were used in the appraisals for the beach home sales. The government seeks to admit summary charts that track and summarize the appraised values of the homes over time with values from the Appraisal District and from the private appraisers involved in the beach home sales. All of the underlying documents for these summary charts have been marked for admission in evidence and have been provided to the defense. *See* Fed. R. Evid. 1006.

The government seeks to admit the tax returns of Brannan, Beach Candy, Closs, Wiley, and Pate. These documents are admissible as public records. Fed R. Evid. 803(8). The government also seeks to admit the tax preparation records of the accountant who prepared the returns. These documents are business records under Fed. R. Evid. 803(6) and many are also admissions by Defendant under Fed. R. Evid. 801(d)(2)(A).

## MOTIONS *IN LIMINE*

## I.     Defendant's Proffered Expert Testimony Should Be Excluded

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court observed that Rule 702 envisioned a "flexible" inquiry focusing "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95. The basic question under *Daubert* is "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand

or determine a fact in issue" — in other words, whether the expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *See id.* at 592. 597; *see also Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (per curiam) ("In *Daubert*, the Supreme Court explained that Rule 702 assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant.") (internal quotation marks omitted). The twin requirements of reliability and relevance are applicable to all expert witnesses, not just scientific ones. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The expert testimony must "assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. In other words, expert testimony must "bring to the jury more than the lawyers can offer in argument." *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992).

On April 19, 2018, Defendant provided to the government by email a summary of his proposed expert testimony. That cursory description is attached as Exhibit A. Defendant would call as a witness a Houston real estate attorney and title company owner named Charles Mansour. According to Defendant:

> "Mr. Mansour will be testifying about the tax laws during the time Mr. Brannan sold his beach homes with respect to family limited partnerships and why it would benefit him to transfer property out of the limited partnership to individual family members."

> "Mr. Mansour will be testifying about real estate sales agreements and the different types of listing agreements such as flat fee, percentage fee, and net fee."

> "He will also testify regarding requirements of HUD statements in general and with respect to outside of closing costs. (POC)  He will express an  opinion that there is no place on the HUD form for P.O.C.'s and that it is the responsibility of the closing agent to note such costs on the margins of the form."

*See* Ex. A.

For a host of reasons, none of Mansour's proffered testimony is proper expert testimony, and it should be excluded.  First, the proposed testimony is improper legal opinion.  Second, Defendant has given improper notice of Mansour's specific opinions and the bases for those opinions.  Third, the testimony is an attempt to testify by proxy and avoid cross-examination.  Fourth, the testimony is not relevant or helpful to the jury.

## A.    An Expert May Not Define the Law for the Jury

Defendant's proposed testimony invades the exclusive province of the Court to decide what the law is and to instruct the jury.  If necessary, this Court is perfectly capable of defining for the jury what the tax or partnership laws were in 2006, if they indeed changed in any relevant way at that time.  And the Court can also instruct the jury on the requirements of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq*. and its implementing regulations, 24 C.F.R. § 3500, *et seq*. and appendices that were in force in 2006 and 2007 and which governed disclosures on HUD-1 settlement statements.

The law is clear that expert legal opinion is impermissible. "Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards." *Burkhart v. Wash. Metro. Area Transp. Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997). "An expert may never render conclusions of law." *Goodman v. Harris Cty.*, 571 F.3d 388, 399 (5th Cir. 2009). This is because "there is one, but only one, legal answer for every cognizable dispute," and "[t]here being only one applicable legal rule for each dispute or issue, it requires only one spokesman of the law, who is of course the judge." *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997). Indeed, as the Fifth Circuit has recognized, "allowing attorneys to testify to matters of law would be harmful to the jury," because "the jury would be very susceptible to adopting the expert's conclusion rather [than] making its own decision." *See id.* ("There is a certain mystique about the word 'expert' and once the jury hears of the attorney's experience and expertise, it might think the witness even more reliable than the judge."). In addition, if experts were "allowed to testify to legal questions, each party would find an expert who would state the law in the light most favorable to its position," and "[s]uch differing opinions as to what the law is would only confuse the jury." *Id.*; *see also Brown*, 705 F.3d at 537 & n.18 (affirming the exclusion of "transparently subjective" expert testimony that included "plainly inadmissible legal opinions," including an analysis of federal regulations); *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir.

1983) (noting that "allowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant").

Similarly, a party may not introduce an expert's opinion regarding whether the party complied with relevant law, including in the form of hypothetical questions. In *Estate of Sowell v. United States*, 198 F.3d 169 (5th Cir. 1999), the court affirmed the exclusion of expert testimony regarding what a reasonable estate executor would do in hypothetical situations identical to the facts underlying the case. The Fifth Circuit concluded that the proffered testimony was inadmissible because the expert would have simply "espouse[d] his opinion on the facts of the case." *See id.* at 171-72. Such testimony would constitute a legal opinion that would "implicate the same concerns" involving dueling legal experts. *See id.* at 172; *see also Snap-Drape, Inc. v. Comm'r of Internal Revenue*, 98 F.3d 194, 198 (5th Cir. 1996) (affirming the exclusion of expert witness reports that "consist[ed] of nothing more than legal arguments"). It is also improper jury argument.

Consistent with Fifth Circuit precedent, this Court has repeatedly excluded expert testimony regarding legal opinions or conclusions. *See, e.g.*, *Fisher v. Halliburton*, Order, Civil Nos. H-05-1737, H-06-1971, H-06-1168, 2009 WL 5216979, at *2 (S.D. Tex. Dec. 21, 2009) ("First, experts cannot assert what law governs an issue or what the applicable law means because that is a function of the court. . . . Expert testimony is an improper mechanism for offering legal arguments

to the [c]ourt . . . [because it] would be unfair to [one party] for the [c]ourt to award [the opposing party]'s legal arguments the elevated stamp of expert.") (internal quotation marks omitted) (alterations and omissions in original); *Floyd v. Hefner*, 556 F. Supp. 2d 617, 640 (S.D. Tex. 2008) ("An expert witness may not offer testimony regarding legal conclusions."); *Morris v. Equifax Info. Servs., LLC*, Order, Civil No. H-04-423, 2005 WL 5976334, at *2 (S.D. Tex. Jan. 19, 2005) ("Legal opinions and conclusions are not a proper subject of expert testimony because they do not assist the jury in understanding the evidence, but merely tell the jury what result to reach. Lawyer experts cannot opine as to what law governs an issue or what the applicable law means because that function belongs to the Court.") (internal citation omitted). *See generally In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) ("[E]very circuit has explicitly held that experts may not invade the court's province by testifying on issues of law.").

Defendant's proposed testimony about the requirements of what should or should not be included on a HUD-1 settlement statement and the testimony about the effect of tax laws in force in 2006 are clear examples of expert testimony on the law. That testimony is not permissible and should be excluded.

## B. Defendant Has Provided Improper Notice of the Proposed Expert Testimony

The emailed summary of Mansour's opinions is deficient under Federal Rule of Criminal Procedure 16(b)(1)(C) as it fails to provide the bases and reasons for his

opinions or even specifically, what the opinions are.  Defendant's deficient notice

does not allow the government "a fair opportunity to assemble and submit evidence

to contradict or explain the opponent's case."  *Taylor v. Illinois*, 484 U.S. 400, 410-

11 (1988).  For example, the summary states that "Mr. Mansour will be testifying

about real estate sales agreements and the different types of listing agreements such

as flat fee, percentage fee, and net fee."  It does not say what he will be saying about

these different listing agreements and fee arrangements.  Therefore, the relevance of

the testimony is unclear.  Under the facts set forth above, flat fee, percentage fee, or

net fee are not relevant to an issue that is in dispute in this case.

In addition, the notice does not give the bases and specific opinions related to

the proposed tax law testimony.  Specifically, what tax law changed and when, how

did it change, how does that change in the law apply to Brannan for tax purposes,

what is the effect on Brannan's tax liability, and how did transferring properties from

a partnership to his children lessen Brannan's tax burden.

Regarding the testimony about HUD-1 settlement statements, the summary

does not say what the basis is for Mansour's opinion about what belongs on a HUD-

1 form and what does not.  It is unclear whether Mansour is relying on RESPA, the

related CFRs, or some other rule.  He does not say what type of closing costs qualify

as "outside of closing costs," which in his opinion do not need to be reported on the

HUD-1 form. His circular reasoning about what does not need to be reported on a HUD-1 renders his opinion unreliable and irrelevant.

### C. The Proposed Testimony Is an Attempt to Testify by Proxy and Avoid Cross-Examination

Expert testimony is improper if it amounts to an attempt by a defendant to "testify by proxy, that is, to elicit the aid of a so-called expert to expound on [the defendant]'s mental state and thereby avoid taking the witness stand and undergoing rigorous cross-examination." *United States v. Tucker*, 345 F.3d 320, 330 (5th Cir. 2003). Defendant seeks to put on his defense that he created the three suspect comps for legitimate tax reasons without taking the stand and saying that himself. Instead, he would like to suggest through his expert that he was motivated by legitimate tax concerns. If defendant wants to put on that defense, he can take the stand and testify to his state of mind at the time he supposedly transferred the three properties to his children. An expert, however, cannot do it for him. *See United States v. Bilotto*, 2005 WL 5978665 at *2 (W.D. Tex. Sept. 27, 2005) (holding that defense expert would not be permitted to testify "by proxy" that the defendant did, in fact, rely upon the advice of others and did not intend to commit fraud). Any testimony by an expert suggesting what Brannan knew, or believed, or intended violates Rule 602 of the Federal Rules of Evidence requiring personal knowledge.

### D. The Proposed Testimony Is Not Relevant or Helpful to the Jury

In addition, Mansour's proposed testimony that there was a tax advantage to Brannan's actions is irrelevant unless Brannan supplies the missing link in the chain of relevance. Under Rule 401 of the Federal Rules of Evidence, "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." There may be any number of reasons someone might have wanted to transfer ownership of their beach homes to their children. However, unless Brannan tells the jury which reason was, in fact, <u>his reason</u>, evidence of hypothetical reasons to sell to one's children is irrelevant. The existence of a potential reason to sell does not make a fact at issue (Brannan's particular reason to sell) any more or less likely.

## II. Self-Serving Hearsay Offered by Defendant Should Be Excluded

During the course of trial, the defense may attempt to introduce out-of-court, exculpatory statements of the defendant through witnesses or exhibits. Specifically, Defendant may try to introduce his own hearsay testimony that he transferred the three beach properties to his children for tax avoidance reasons. For example, Defendant may try to introduce the recorded statement in which he makes this claim, or he may try to elicit the statement from Agent Dalton, the investigator who interviewed and recorded him. He may also try to introduce the tax explanation through the testimony of family members who would be testifying to what they

learned from the defendant. All of these attempts to introduce Defendant's own hearsay would be improper. If Defendant would like to explain to the jury why he took the actions he did, he must do it himself.

A defendant's out-of-court statement, when offered by the defendant, is classic hearsay under Rule 801 for which there is no exception. It is therefore inadmissible, a principle the Fifth Circuit has consistently applied. *United States v. Reyes*, 239 F.3d 722 (5th Cir. 2001) (affirming exclusion of the defendant's recorded statement when offered by the defendant); *United States v. Bond*, 87 F.3d 695 (5th Cir. 1996) (holding a transcript of defendant's recorded statement inadmissible); *United States v. Bishop*, 264 F.3d 535, 549 (5th Cir. 2001) (defendant's out-of-court statements to others were inadmissible as hearsay because they "were self-serving assertions that he did not have the requisite intent for the crime"); and *United States v. Liu*, 960 F.2d 449, 452 (5th Cir. 1992) (defendant's out-of-court statements were inadmissible as hearsay and inadmissible to show the state of mind exception to the hearsay rule).

Although the defendant's statements are admissible when offered by the government, they are not admissible when offered by the defendant. See *United States v. Ortega*, 03 F.3d 675, 682 (9th Cir. 2000) (holding that a defendant's statement, when offered by the government, is an admission by a party opponent, but that a defendant's statement remains inadmissible hearsay when offered by the defendant); *United States v. Palow*, 777 F.2d 52, 56 (1st Cir. 1985) ("The requirement

of Rule 801(d)(2(A) that an admission be offered against a party is designed to exclude the introduction of self-serving statements by the party making them."). In other words, although the government may introduce the defendant's out-of-court statements, the defendant may not. *United States v. Marin*, 669 F.2d 73, 84 (2nd Cir. 1982).

Furthermore, it does not matter whether the statements themselves are inculpatory or exculpatory, as the admissibility of a statement under Rule 801(d)(2) does not hinge on whether the statement is against the party's interest. See *United States v. Reed*, 227 F.3d 763, 770 (7th Cir. 2000). Whether in the form of cross-examining government witnesses, direct examination of his own witnesses, or attempting to introduce exhibits, Defendant should not be able to avoid testifying by introducing inadmissible hearsay.

## III. Testimony about Particular Prior Convictions Should Be Excluded

The Court should preclude evidence or argument about the matters listed below:

**Witness Shawn Mitchell**

- Forgery to defraud or harm of another: class A misdemeanor
   o District Court Houston: convicted and released on March 11, 1999
- Forgery of a financial instrument: state jail felony
   o District Court Houston: convicted and released on July 21, 1999

**Witness Freeman Utley**

- Aggravated manufacture/delivery/possession of a controlled substance: 1st degree felony
    - o District Court Houston: convicted on November 4, 1994
- Possession of a controlled substance: 1st degree felony
    - o District Court Houston: convicted on March 8, 1996
- Manufacture/delivery/possession of a controlled substance: 1st degree felony
    - o District Court Houston: convicted on August 3, 1999. Released September 3, 1999.

**Witness Derwin Blackshear**

- Possession of a controlled substance
    - o District Court Houston: arrested on August 5, 1987; no conviction date
    - o Received 2 years in confinement
- Possession of a controlled substance
    - o District Court Houston: arrested on November 23, 1987; no conviction date
    - o Received 2 years in confinement; concurrent with previously mentioned conviction
- Possession of a controlled substance
    - o District Court Houston: arrested on January 7, 1988; no conviction date
    - o Received 2 years in confinement; concurrent with previously mentioned convictions
- Possession of a controlled substance
    - o District Court Houston: arrested September 29, 1988; no conviction date
    - o Received 7 years in confinement; concurrent with previously mentioned convictions
- Theft of property greater than $500: class A misdemeanor
    - o Fort Bend County: convicted on January 23, 2007; sentenced to 365 days.

This evidence is not relevant and is remote in time, as more than 10 years have elapsed since the date of conviction or the date of release from confinement in each case. *See* Fed. R. Evid. 609(b).  In addition, Defendant can point to no "specific facts and circumstances" to show that the probative value of the conviction substantially outweighs its prejudicial effect.  Any evidence, argument, or questioning about these convictions should be excluded.

## IV.   Inflammatory Evidence, Argument, or Questioning about Wells Fargo Bank Should Be Excluded

Irrelevant and inflammatory evidence, argument, or questioning related to Wells Fargo Bank should be excluded.  One of the government's witnesses is a representative of Wells Fargo Bank.  Wells Fargo was one of the banks that was defrauded in this mortgage fraud scheme.  Wells Fargo has recently been in the news for various alleged forms of corporate misconduct, resulting in a large fine to be paid to the United States.  The government's witness is a financial crimes manager at Wells Fargo.  His job is to help prevent Wells Fargo from being victimized by financial crimes like mortgage fraud.  He had no involvement in the aggressive or misleading sales practices of the bank that have been featured in the news.  His testimony will primarily concern the type of information in loan applications the bank relies upon in making a lending decision.  Any questioning, evidence, or argument about Wells Fargo's recent alleged corporate misconduct or any fine paid by the bank would be irrelevant to any issue properly before the jury.  The corporate

misconduct does not relate to how Wells Fargo evaluates loans and it does not relate to this witness' job, his character for truthfulness, or his testimony. *See* Fed. R. Evid. 401. In addition, any questioning, evidence, or argument concerning this topic would be unfairly prejudicial, would confuse the issues before the jury, and should be excluded. *See* Fed. R. Evid. 403.

## V. Argument or Questioning Related to Charging Decisions Should Be Excluded.

Argument or questioning about the government's charging decisions is improper and potentially seeks jury nullification. Jury nullification is the rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the juror's sense of justice, morality, or fairness. *See United States v. Edwards*, 303 F.3d 606, 633 n.15 (5th Cir. 2002). "[T]rial courts have the duty to forestall or prevent such conduct." *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997).

This issue would likely come up with respect to the witness Shawn Mitchell. Defendant may seek to create the impression among the jurors that Brannan was unfairly charged, when Mitchell, who was a central player in the scheme, was not federally charged. Mitchell, however, was charged by the state in 2009 for engaging in organized criminal activity from 2004 to 2008 based on his involvement with mortgage fraud in Houston. The state charges allege that Mitchell committed that

crime using his dba TMAC Consulting, which was involved in this case as well, and that he committed the crime with James Fitchett who, along with Mitchell, was also involved in the fraudulent beach home sales. Mitchell pled guilty to a first-degree felony, was sentenced to 7 years in state custody, and was already in prison by the time the federal case was charged. Any questioning about why Mitchell was not charged federally will result in a discussion of the Department of Justice's *Petite* Policy, none of which is relevant for the jury and potentially could lead to confusion. Any questioning related to the fact that Mitchell was not charged federally for his mortgage fraud activity should be excluded under Fed. R. Evid. 401 and 403.

Respectfully submitted,

RYAN K. PATRICK
UNITED STATES ATTORNEY


/s/ *Robert S. Johnson*
Robert S. Johnson
Michael Day
Assistant United States Attorneys

## <u>CERTIFICATE OF SERVICE</u>

On April 27, 2018, the United States electronically filed this Trial Brief and Motions *in Limine* and provided an electronic copy to counsel for Defendant.

/s/ *Robert S. Johnson*
Robert S. Johnson
Assistant United States Attorney